UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN DOMINICK BRUZZESE,                           :
                                                                  :          **23 Civ. 171 (GS)**
                                    Plaintiff,          :
                                                                  :          <u>**OPINION & ORDER**</u>
                  - against -                                 :
                                                                  :
COMMISSIONER OF SOCIAL SECURITY,    :
                                                                  :
                                    Defendant.       :
-------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

Plaintiff John Dominick Bruzzese ("Bruzzese" or "Plaintiff") seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of a final determination denying his claim for social security disability benefits. Both Plaintiff and Defendant, Commissioner of the Social Security Administration ("SSA"), have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, Buzzese's motion is **GRANTED**, the Commissioner's cross-motion is **DENIED**, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

**A.    Procedural History**

On February 23, 2010, Bruzzese filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Dkt. Nos. 4, 21 (Administrative Record ("AR") 204, 628-35). Plaintiff alleges a disability onset date of December 31, 2008. (AR 16, 20).

The SSA initially denied Bruzzese's application on July 12, 2010, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") less than a month later. (AR 248-263). A hearing was conducted on August 24, 2011 before ALJ Dennis G. Katz. (AR 155-186).

In a decision issued on October 12, 2011, ALJ Katz found Bruzzese disabled on the basis of various mental impairments, and Plaintiff subsequently began receiving DIB. (AR 195-204 (the "2011 Decision")).

This case then took an unexpected turn. Due to allegations of fraud from Plaintiff's ex-wife and her boyfriend, the agency's Cooperative Disability Investigations Unit ("CDI") began an investigation of Bruzzese in 2014. (AR 216, 1166). CDI's investigation culminated in a Summary Report of Investigation dated May 20, 2019 (the "CDI Report"). (AR 1166-1200). The CDI Report requested that the SSA's Office of Disability Adjudication and Review reevaluate Plaintiff's DIB claim. (*See id.*). As a result, the SSA reopened the 2011 Decision and directed ALJ Katz to hold an additional hearing. (AR 216).

That hearing was held on December 9, 2019. (AR 58-137). Two weeks later, on December 27, 2019, ALJ Katz found that his 2011 Decision was properly reopened and reconsidered since it was the result of fraud or similar fault, and further found Plaintiff to be not disabled at any time from December 31, 2008 through December 31, 2014, the date Plaintiff was last insured. (AR 216-231 (the "2019 Decision")).

Bruzzese appealed this adverse decision to the SSA's Appeals Council. (AR 450-52). In an order dated October 30, 2020, the Appeals Council vacated the 2019 Decision and remanded Plaintiff's case. (AR 240-45). The Appeal Council also directed that the case be assigned to another ALJ on remand. (AR 242). A third hearing was held before ALJ Michael J. Stacchini on October 21, 2021. (AR 2255-2354).

On December 15, 2021, ALJ Stacchini issued a decision finding—like the 2019 Decision—that Plaintiff was not disabled at any time from his alleged onset of disability at the end of 2008 through the end of 2014. (AR 13-33 (the "2021 Decision")). As with the 2019 Decision, Bruzzese again requested the Appeals Council's review, which the Council denied. (AR 624-27). That denial constituted the Commissioner's final decision for purposes of judicial review.

Bruzzese timely commenced this action on January 3, 2023. (Dkt. No. 1). The Commissioner[1] answered the Complaint by filing the administrative record on March 13, 2023.[2] (Dkt. No. 4). Bruzzese filed a motion for judgment on the pleadings and a memorandum of law in support of the motion on June 22, 2023. (Dkt. Nos. 22, 23 ("Pl. Br.")). The Commissioner submitted a brief opposing

---

[1] At the time this action was commenced, the Acting Commissioner of Social Security was Kilolo Kijakazi. On December 20, 2023, Martin T. O'Malley became the Commissioner of Social Security. Accordingly, this Opinion & Order uses male pronouns when referring to the Commissioner.

[2] This filing did not include a full transcript of Plaintiff's hearing before ALJ Stacchini. The government supplemented the administrative record to include that transcript on June 12, 2023. (Dkt. No. 21).

Bruzzese's motion on July 31, 2023.  (Dkt. No. 24 ("Gov. Br.")).[3]  Bruzzese filed a reply brief on August 10, 2023.  (Dkt. No. 25 ("Reply")).

## B.    Administrative Record

During these proceedings, Bruzzese has claimed disability due to both physical and mental impairments.  The 2011 Decision found him disabled based on his severe mental impairments alone.  (AR 201-04).  On the other hand, the 2021 Decision found only Plaintiff's physical impairments (and not his mental impairments) to be severe.  (AR 20).  Meanwhile, the 2019 Decision found a combination of severe physical and mental impairments.  (AR 222).

In this Court, Bruzzese takes aim at the 2021 Decision's treatment of both his physical and mental impairments.  He contends that the ALJ erred in his evaluation of the medical opinion evidence with respect to his physical impairments as well as the ALJ's determination that his mental impairments were not severe.  (*See* Pl. Br. at 31-46).  Accordingly, the Court's discussion of the administrative record addresses the ALJ's findings with respect to both physical and mental impairments.  While disputing Plaintiff's conclusions and inferences from the evidence, the Commissioner agrees with the recitation of the relevant facts in Plaintiff's brief.  (*See* Gov. Br. at 2 & n.2).

---

[3] While the Commissioner did not file a cross-motion for judgment on the pleadings in his favor, the Court construes his brief as seeking such relief.  *See Rodriguez v. Comm'r of Soc. Sec.*, No. 22 Civ. 10665 (GS), 2024 WL 1342834, at *1 n.2 (S.D.N.Y. Mar. 29, 2024).

### 1.    Bruzzese's Background

Bruzzese was 39 years old on the alleged onset date of his disability, December 31, 2008, and is now 54 years old.  (AR 629).  He has a high school degree and attended three years of college.  (AR 177, 677, 2189).  When he first filed for social security benefits in 2010, Bruzzese was married to his now ex-wife Sylvia, with whom he has three children.  (AR 219, 977).  Over the lifetime of this case, Bruzzese's children have become adults, and two of them have written to the Commissioner in favor of their father's disability claim.  (AR 970-76).

Prior to his claim of disability, Bruzzese worked for fifteen years for the New York City Police Department ("NYPD").  (AR 17).  He began as a police officer and was subsequently promoted to sergeant and then lieutenant.  (AR 2273).  After having back surgery at the end of 2007, he was given a "limited duty" assignment as an "integrity control officer."  (AR 2273-74).  Bruzzese worked in this position for about a year until the end of 2008, when the NYPD forced him to retire due to his back injuries.  (AR 2281).  He then retired on a 3/4ths disability pension.  (AR 1187).

### 2.    Healthcare History Prior to 2011 ALJ Decision

#### a.  Bruzzese's Back Surgery

In 2002, Bruzzese fell down some stairs while chasing a suspect, injuring his back and leading to pain in his lower back and left leg.  (AR 994, 1020-22, 1023).  In April 2007, an elevator accident exacerbated his back issues.  (*See id.*).  In June and November 2007, Bruzzese was referred for two MRIs of the lumbar spine by Dr. Michael Murray, a board-certified orthopedic spinal surgeon.  (AR 113, 1038-39).

These MRIs revealed diffuse disc desiccation most prominently at L4-L5 and L5-S1 and a central and left sided extruded and sequestered disc herniation.  Further, Dr. Murray observed minor degenerative discogenic endplate changes, in addition to a bulging disc encroaching Plaintiff's back nerve.  (AR 1039-40).

Following the MRIs, Dr. Jeffery Spivak performed a L4-L5 micro lumbar diskectomy on Plaintiff in December 2007.  (AR 994-95).  Although this operation improved Bruzzese's soreness in his extremities, by February 8, 2008, he returned to Dr. Spivak reporting increased lower back pain, which worsened with physical activity and after sleeping.  (AR 1035-36).  A physical examination by Dr. Spivak revealed moderate spasms and a limited range of motion in Plaintiff's back, general back pain, and bilateral hamstring tightness.  (AR 1036).

### b. Appointments with Dr. Murray

On February 5, 2009, Plaintiff returned to Dr. Murray.  (AR 1087).  He reported his pain had worsened to the point of being "debilitating" and was typically worse either "with prolonged sitting" or "with increased activity."  (*Id*.).  Dr. Murray ordered an MRI, which, even after Plaintiff's diskectomy, revealed many of the same problems as the pre-surgery MRI.  Among other things, the imaging revealed "recurrent disc herniation" and that Plaintiff's L4-5 disc was "again noted to be degenerative manifesting as loss of disc space height and . . . intensity."  (AR 1057).

At a follow up appointment with Dr. Murray on May 1, 2009, Plaintiff reported persistent left flank pain, and an examination performed by Dr. Murray revealed pain when Plaintiff raised his leg.  (AR 1088).  Notably, however,

Plaintiff's back pain levels decreased since he had stopped working. At the time, Dr. Murray recommended a conservative treatment approach due in part to certain insurance coverage issues that could accompany more active treatment recommendations, such as additional surgeries or a disc fusion. (*Id.*). At an appointment the following month, Plaintiff's condition remained unchanged. (AR 1089).

Plaintiff visited Dr. Murray on February 24, 2010 for his next follow up appointment. According to Dr. Murray's treatment notes, Plaintiff reported "difficulty with prolonged sitting, standing, or walking," and "debilitating" pain. (AR 1090). While Plaintiff was healing well in certain respects from surgery, Dr. Murray examined Plaintiff and found lumbosacral junction tenderness, recurrent positive straight leg raising tests, and decreased motor strength in the bilateral lower extremities measured at 4+ on a 5 out of 5 scale. Dr. Murray assessed that Plaintiff was suffering from L4-L5, L5-S1 lumbar disc disease "with persistent painful radiculopathy." (*Id.*). In his view, Plaintiff was "totally permanently disabled from his injuries," in part because "he [could not] sit or stand for any prolonged period of time." (*Id.*).

At Plaintiff's next visit on April 28, 2010, Dr. Murray reviewed Plaintiff's March 2010 MRI results. (AR 1091). The imaging showed "sclerosis and some other changes across the end plate," a "left paracentral disc herniation" which was not abutting the L5 nerve root, and a "disc osteophyte complex" with "some compromise on the S1 root." (AR 1091). Dr. Murray's assessment of Plaintiff and

his examination results remained the same as from the previous visit.  (*Compare* AR 1091 *with* AR 1090).  For these reasons, Dr. Murray reiterated his opinion that "John is totally permanently disabled from his injuries" and "cannot sit or stand for any prolonged period of time."  (*Id.*).  He instructed Plaintiff to refrain from lifting any more than "5 pounds at a time," while remarking that he "is going to need continued care, physical therapy several times a year and chronic pain management."  (*Id.*).

In certain respects, Plaintiff's physical condition deteriorated thereafter.  During a subsequent visit to Dr. Murray on October 13, 2010, a physical examination revealed a decreased range of lumbar spine motion and tenderness across the lumbosacral junction, noticeable decreased muscle strength, and another positive leg raise test result.  (AR 1092).  As a result, Dr. Murray prescribed a series of epidural injections.  (AR 181, 1092-93).  At a follow up appointment on April 15, 2011, Bruzzese reported continued and persistent radicular pain.  A physical examination confirmed "[l]umbar disc disease with persistent painful radiculopathy," disc space collapse, and a decreased range of lumbar spine motion bilaterally, among other ailments.  (AR 1093).

In Dr. Murray's treatment plan from that 2011 visit, he recorded his belief that Bruzzese "is still permanently totally disabled and will require further surgical repair," and that Bruzzese's current pain levels were "significantly affecting his activities of daily living."  (AR 1093).  Plaintiff was also prescribed to wear an abdominal brace and to take 750mg of Vicodin as needed for his pain.  (AR 1094).

### c.  Dr. Zucker

Dr. Albert H. Zucker, Plaintiff's long-time internist (AR 29), was frequently responsible for refilling Plaintiff's prescription pain medications and muscle relaxants for his back.  (*See, e.g.*, AR 1106).  For example, on June 22, 2011, Plaintiff reported chronic lower back pain to Dr. Zucker, who in turn prescribed Fexeril and Vicodin.  (AR 1107).  In a follow up visit, Plaintiff again reported chronic lower back pain.  (AR 1108).

Dr. Zucker filled out a Medical Source Statement of Ability To Do Work-Related Activities (Physical) on August 23, 2011.  (AR 1097-1102).  On this form, Dr. Zucker opined that Plaintiff could occasionally lift or carry up to ten pounds; sit, stand, or walk one hour at a time; and sit or stand two hours total, and walk one hour total, in an 8-hour workday.  (AR 1098).  Dr. Zucker further opined that Plaintiff could occasionally climb stairs and ramps but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.  (AR 1100).  Dr. Zucker also checked "no" to the question "[c]an the [claimant] walk a block at a reasonable pace on rough or even surfaces?"  (AR 1102).

### d.  SSA Consultative Examiner

At the direction of the SSA, Bruzzese had an appointment with Dr. Leena Philip, a specialist in internal medicine, on June 9, 2010.  (AR 1058).  Dr. Philip's report described Plaintiff's back pain as "a 7/10, sharp, at times dull, constant, worsened with activity, and decreasing with frequent change of position."  (AR 1058).  A physical examination revealed a reduced ability to squat, a decreased

range of lumbar spinal motion, and significantly decreased strength in Plaintiff's left lower extremities. (AR 1059-60). Dr. Philip diagnosed Plaintiff with "[l]ow back pain with history of herniated disks, status post diskectomy in 2007," and depression, among other diagnoses. (AR 1061). For all of Plaintiff's various diagnoses, his prognosis is listed as "fair" and Dr. Philip, without further specification, opined that "the claimant has moderate limitations to heavy lifting, carrying, bending, prolonged standing, and walking due to low back pain." (*Id.*).

### e. State Agency Physician

On July 8, 2010, a state agency physician[4] submitted a Physical Residual Functional Capacity Assessment based on that doctor's review of Plaintiff's medical records until that point. (AR 187-93). The state agency physician reported, *inter alia*, that Plaintiff could only occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, and was limited in his lower extremities. (AR 188). However, no limitations on Plaintiff's ability to stand, walk, or sit were noted; according to the assessment, Plaintiff could stand and/or walk and sit with breaks for about six hours of a normal workday. (*Id.*).

After recounting Dr. Murray's treatment of Plaintiff and his daily activities until July of 2010, the state agency physician wrote that Dr. Murray's opinion that Plaintiff was totally permanently disabled was "unsupported [e]specially after surgical decompression and there is no evidence of nerve compression now in the lumbar spine." (AR 191). In the state agency physician's view, Plaintiff was able to

---

[4] The full name of the state agency physician is not known based on the record alone, as that individual electronically signed the assessment as "Putcha, S." (AR 193).

perform light work with certain limitations because, while Bruzzese's "allegations" of "functional limitations of walking, standing, heavy lifting an[d] heavy carrying due to pain" were "credible," they were not credible "to the degree alleged." (*Id*.).

### f. Mental Health Treatment with N.P. Thompson

Plaintiff first began seeking mental health treatment with Martha Thompson, a psychiatric nurse practitioner ("N.P. Thompson"), in 2009. (*See* AR 96-97). On August 15, 2010, N.P. Thompson evaluated Bruzzese in connection with symptoms related to depression and anxiety. (AR 1945).

In her psychiatric evaluation during Plaintiff's August 15, 2010 visit, N.P. Thompson noted that Plaintiff relayed having problems sleeping, eating, and with his energy levels. (*Id*.). She diagnosed Plaintiff with major depressive disorder, recurrent; anxiety disorder; panic disorder without agoraphobia; and dysthymia, while (at that time) ruling out post-traumatic stress disorder and bipolar disorder. (AR 1947). Plaintiff was prescribed antidepressants and antianxiety medications. (*Id*.).

N.P. Thompson's treatment notes for the remainder of 2010, and until Bruzzese's first hearing before an ALJ in 2011, reveal the waxing and waning of Plaintiff's mental health symptoms. For example, at various points, Bruzzese reported some mild improvements to his symptoms (*see, e.g.*, AR 1941), while at others, Plaintiff reported a wider range of symptoms such as an angry affect (AR 1935), a sad and irritable mood (AR 1922), and mood swings (AR 1931). All the

while, Plaintiff consistently conveyed to N.P. Thompson that he was dealing with chronic and "pretty bad" back pain.  (AR 1922, 1931).

In N.P. Thompson's Medical Source Statement of Ability To Do Work-Related Activities (Mental) (AR 1138-40), submitted to the SSA after Plaintiff's initial hearing before ALJ Katz, but before the 2011 Decision (*see* AR 195, 293), N.P. Thompson reported that Plaintiff had been treated for major depression that was moderately severe-to-severe at times, and that the medications she had prescribed had not ameliorated his symptoms.  (AR 1138).  N.P. Thompson also noted that Plaintiff suffered daily symptoms of, *inter alia*, depression, panic, anxiety, chronic pain, social withdrawal, and low frustration tolerance.  (AR 1139).  She further diagnosed him with post-traumatic stress disorder based on childhood trauma and the events of September 11, 2001.  (AR 1138-39).

In filling out the form's checked boxes, N.P. Thompson marked the following areas as "extreme" limitations for Plaintiff: his capacity to (1) interact appropriately with co-workers and (2) respond appropriately to usual work situations and to changes in a routine work setting.  (AR 1139).  At the same time, the report noted that Plaintiff had "marked" limitations in the following areas: (1) carrying out complex instructions; (2) making judgments on complex work-related decisions; and (3) interacting appropriately with supervisors.  (AR 1138-39).  It further reported "moderate" limitations in (1) the ability to make judgments on simple work-related decisions; (2) understanding and remembering complex instructions; and (3) interacting appropriately with the public.  (*Id.*).

### 3.    The 2011 Hearing and Decision Finding Disability

Bruzzese and his counsel appeared before ALJ Katz for a hearing on August 24, 2011.  Prior to the hearing, Bruzzese's application for DIB claimed only physical impairments, relying on his lower back ailment.  (AR 676).  However, at the outset of the hearing, Bruzzese's counsel for the first time mentioned that Plaintiff had been receiving mental health treatment from N.P. Thompson and asked to supplement the record.  (AR 159-60).[5]  Bruzzese testified at the hearing as to both his mental and physical impairments.  (AR 161-83).

In his decision dated October 12, 2011, ALJ Katz found, at step one, that Bruzzese had not engaged in substantial gainful activity since the alleged onset date of December 31, 2008.  (AR 201).  He also found, at step two, that Plaintiff suffered from certain severe mental impairments: "mood disorder; bipolar illness; major depression recurrent, moderate to severe; panic disorder without agoraphobia, and posttraumatic stress disorder (PTSD)."  (*Id.*).

Turning to step three, ALJ Katz found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the applicable regulations, but simultaneously found that Plaintiff had moderate restrictions in activities of daily life, mild difficulties in social functioning, and marked difficulties in maintaining concentration, persistence, or pace.  (*Id.*).

---

[5] This led to N.P. Thompson's submission of the Medical Source Statement of Ability To Do Work-Related Activities (Mental), dated August 31, 2011.

The ALJ then turned to Plaintiff's ability to work given his mental impairments. Here, the ALJ found that Plaintiff "has the residual functional capacity to perform less than the full range of sedentary work." (*Id.*). To arrive at this finding, the ALJ relied on the medical evidence submitted by Plaintiff with respect to both his back issues and his mental health struggles. After recounting Dr. Murray's and N.P. Thompson's treatment of Bruzzese in some detail, the ALJ found "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limited effects of those symptoms are generally credible, and supported by the reports of his treating physicians." (AR 202). In particular, the ALJ gave "controlling weight" to Dr. Murray's opinion that Plaintiff "was restricted to lifting a maximum of 5 pounds" and Dr. Zucker's opinion that claimant could "sit an aggregate of 5 hours, and lift/carry a maximum of 10 pounds, occasionally."[6] (*Id.*). He also gave "great weight" to N.P. Thompson's assessment that Plaintiff "has moderate to extreme functional limitations" as a result of his mental impairments. (AR 202-03).

Based on those conclusions, the ALJ found at step four that Plaintiff had a residual functional capacity ("RFC") to "sit 5 hours, stand/walk 3 hours, and lift/carry items weighing 5 pounds during an 8-hour workday." (AR 203). Plaintiff's

---

[6] The ALJ's reference to sitting an aggregate of five hours appears to have been a mistake. In fact, Dr. Zucker had stated that Bruzzese could sit for only two hours during an 8-hour workday. (AR 1098). He also stated that Bruzzese could stand for two hours and walk for one hour during a workday. (*Id.*). Thus, Dr. Zucker opined that Bruzzese could sit, stand, and walk for an aggregate of five hours, not that he could sit for that length of time.

RFC was "further compromised," the ALJ found, by his "chronic pain and a mental impairment that limit his ability to perform complex work tasks." (*Id*.). As a result, the ALJ found that the demands of Plaintiff's past work as a police lieutenant exceeded Plaintiff's established RFC for less than the full range of sedentary work. (*Id*.).

Turning to step five, the ALJ considered Plaintiff's age, education, work experience, and RFC to find that "there are no jobs that exist in significant numbers in the national economy that claimant can perform" under the applicable regulations. (*Id*.). Although the ALJ considered the possibility of Plaintiff performing certain sedentary work that would require a finding of "not disabled," he found that Bruzzese "is further limited by nonexertional limitations that preclude him from performing any more than simple, rote tasks requiring minimal concentration." (AR 204). Thus, Plaintiff was found to be disabled since the alleged onset date of December 31, 2008. (*Id*.).

### 4. The CDI Report

The SSA's CDI in New York issued a Summary Report of Investigation regarding Plaintiff disability benefits on May 20, 2019. (AR 1167). According to the CDI Report, CDI received a hotline tip in January 2014 from Plaintiff's ex-wife. (AR 1168). She reported, among other things, that Plaintiff (1) had "a full wood working shop in his basement," (2) "builds homes including the home he resides in," (3) performs "off the books" carpentry work, and (4) "landscapes his property" during the summer and "shovels snow" in the winter. (AR 1169). The tip also

indicated that Plaintiff "has no issues caring for his personal needs" and "goes fishing, coaches his children's sport teams, lifts and carries heavy items," and "work[s] out" at the gym.  (*Id.*).  At the time, Plaintiff and his ex-wife were in the midst of a bitter divorce proceeding and a dispute over the custody of their children. (AR 970-72, 974-76, 984, 988-89, 1173, 1975, 2150).

This tip prompted CDI to conduct a lengthy investigation spanning several years.  The investigation included reviewing various materials provided by Plaintiff's ex-wife and her boyfriend, Thomas Helmeyer, including testimony from the divorce proceedings; conducting surveillance of locations where Plaintiff allegedly performed construction or carpentry work; and numerous witness interviews.  (AR 1172-86).  Attached to the CDI Report is a "brief" prepared by Helmeyer that, among other things, contains inflammatory charges such as that Bruzzese "manufactured false claims of mental illness and physical limitations to fraud [sic] the SSDI" and was part of a "vast conspiracy of NYPD police officers involved in defrauding SSDI."  (AR 1187-1200; *see* AR 742).[7]

As described in the CDI Report, the investigation revealed, *inter alia*, that Plaintiff had allegedly helped a former colleague with the construction of the latter's basement, which included Plaintiff's cutting and installation of wood.  (AR 1182-83). The report, relying on Helmeyer's brief, goes on to claim multiple instances of Plaintiff providing carpentry and woodworking services to various associates from 2012 to 2016.  (AR 1194-95).  Citing Bruzzese's testimony during his divorce

---

[7] In his 2019 Decision, ALJ Katz mistakenly refers to "Investigator Thomas Helmeyer's report," as if Helmeyer worked for CDI.  (AR 219).

proceeding in May 2014, the CDI Report states that he installed a washer and dryer and other appliances at his home, spackled and painted the first floor, and installed a vanity, toilet, tile, and sink in the bathroom.  (AR 1197).

In addition to descriptions of manual labor, the report alleges that prior to testifying at his first hearing before ALJ Katz, Bruzzese, together with his friend Diego Rivera, "established an investigative business" and used a condominium that Plaintiff owned as a business location.  (AR 1195).  According to CDI, the private investigation business had been active since 2010, and records "indicate the business has revenue of $34,000 a year."  (*Id.*).

Outside of work activities, the report further revealed that Bruzzese, together with his children, drove to an amusement park over eleven hours from his home in Myrtle Beach, South Carolina in August 2010 and was photographed on a log flume ride.  (AR 1193).  He exhibited similar behavior by driving to and from the Busch Gardens amusement park with his children in Williamsburg, Virginia in March 2015.  (AR 1190-91).  The report asserted that Bruzzese rode five different rollercoasters, most multiple times, and attached photographs "clearly show[ing] [him] smiling and enjoying himself."  (AR 1191-92).

In addition, Plaintiff coached a "youth baseball team" in the years 2009, 2010, and 2011.  (AR 1192).  During the season, Bruzzese would hold practices that lasted at least an hour and attend games that "would last roughly 2 hours."  (*Id.*).  According to the report, Bruzzese also frequently attended New York Jets games (as

a season ticket holder), requiring him to sit and stand for prolonged periods of time, and went fishing on a boat in the ocean several times a year.  (AR 1192-93).

Casting doubt on the veracity of the mental impairments Bruzzese claimed at the time of the 2011 Decision, the CDI Report quoted Bruzzese's testimony in the 2014 divorce proceeding denying that he had bipolar disorder and indicating that he no longer suffered from depression and anxiety.  (AR 1198).  It also quoted the testimony of Dr. Janet Wilkie, a clinical psychologist who had been treating Bruzzese and who testified in the divorce proceeding in 2014 that she found Bruzzese, "on the most part, quite insightful and reasonable in his judgments"; that he "does not have a mood disorder"; that she diagnosed him only with "general anxiety disorder"; that "he is not depressed"; and that he does not present "currently as being limited in function in any way."  (AR 1199-1200).

Plaintiff's ex-wife and her boyfriend furnished the same package of materials purportedly supporting their fraud accusations to federal and local prosecutors. (AR 1175-76).  An investigation was commenced at least by the U.S. Attorney's Office for the Southern District of New York.  (AR 977, 1176).  No charges were ever brought against Bruzzese, who in subsequent SSA testimony described the matter as "just an ex-wife making outrageous claims."  (AR 74).

### 5.    Additional Evidence Post-CDI Report

The release of the CDI Report, however, led to the SSA reexamining Plaintiff's claim for benefits, and a subsequent hearing was held before ALJ Katz on December 9, 2019.  (AR 58, 60).  In advance of the hearing, Bruzzese, represented

by new counsel, submitted additional evidence concerning both his physical and mental impairments.

### a. Dr. Murray

Following the CDI Report's release, Plaintiff visited Dr. Murray on October 16, 2019 and reported sharp, stabbing, and shooting back pain. (AR 2207). Dr. Murray performed a lumbar spine examination which revealed, *inter alia*, a decreased range of motion, abnormal sensation in the left L5 dermatomal distribution, and a positive leg straight raise test. (AR 2208). At a follow up appointment on October 21, 2019, an MRI revealed a Tarlov cyst within the sacral spinal canal, mild levoscoliosis, mild facet anthropathy at L1-L4, a bulging disc at L4-L5, and a small central and left paracentral disc herniation abutting the S1 nerve root. (AR 2210). Upon a review of the MRI results, Dr. Murray maintained his prior opinion that Plaintiff remained permanently disabled. (AR 2213).

### b. Letter from Dr. Wilkie

In a letter of support dated November 19, 2019, Dr. Wilkie opined that Bruzzese "currently" has "major depression, PTSD, severe anxiety, and back injuries resulting in inconsistent and limited physical functioning." (AR 1975). Dr. Wilkie reported holding psychotherapy sessions with Plaintiff on a weekly basis beginning in 2012. (*Id*.). While Plaintiff's "mental health varied considerably" over this period, Dr. Wilkie described a deterioration of Plaintiff's mental well-being due to years of contentious court proceedings involving his ex-wife and children, with

his depression "deepen[ing] to the point of almost total incapacity to do anything, including activities of daily living," and making him "extremely suicidal." (*Id*.).

According to Dr. Wilkie's letter, "John mostly lays on the couch all day . . . and he has only enough energy to take basic care of his children, and drive them where they need to go." (AR 1976). Dr. Wilkie also stated that a major factor in Plaintiff's depression is his chronic back pain. (*Id*.). In Dr. Wilkie's professional opinion, Plaintiff had been repeatedly "beaten down" by never-ending legal and familial problems, and "when people are repeatedly beaten down over long periods of time, . . . the prospects for returning to a normal level of functioning are very poor." (AR 1977).

Dr. Wilkie's letter also attempted to explain her 2014 testimony in Bruzzese's divorce proceeding. Dr. Wilkie reaffirmed that at the time of her 2014 testimony, Bruzzese did not have a mood disorder and was not depressed. (*Id*.). As for her testimony that Bruzzese was not "limited in function in any way," Dr. Wilkie said she meant "solely that I did not see him as being limited in any way in functioning as a parent" and "it did not occur to me that the question implied that physical limitations were included." (*Id*.).

### 6.    2019 Hearing before ALJ Katz

At the hearing, the ALJ heard testimony from Plaintiff, Drs. Murray and Wilkie, N.P. Thompson, and a vocational expert, Carrie Anderson. (AR 59-60).

Plaintiff described his prior work as an "Integrity Control Officer" for one year with the NYPD prior to retiring involuntarily due to his back issues. (AR 64-

65).  Addressing the allegations in the CDI Report, Plaintiff testified that, although he hoped to start a private investigation business after he retired and formed a corporation to that end in 2010, he never did any business or seriously tried to do so, and that the claim in the CDI Report that he had more than $30,000 in revenues was "100 percent false."  (AR 66-70).  He acknowledged serving a subpoena and conducting some surveillance, but said he did that only to help out a close friend, Diego Rivera, and would not consider that "work."  (AR 62, 66-67).

Plaintiff disputed other allegations and characterizations about his activities outlined in the CDI Report.  For example, while Plaintiff admitted to being the coach of his son's baseball team, he testified that his role was limited to encouraging kids, and that his physical exertion was minimal.  (AR 71-72).  Similarly, while Plaintiff also admitted to informally supervising certain home renovations, he stated that external professionals did most of the installation work.  (AR 72-73, 90).  He also asserted that he only attended one Jets game in 2010 or 2011 and did not hold season tickets (AR 79-80), and that he had not gone fishing on a boat since retiring from the NYPD.  (AR 80).  He said that on the long drive to South Carolina, he would make frequent stops, stretch, and take his medication to manage his pain.  (AR 88).

N.P. Thompson testified that she did not believe Buzzese was "able to work based on his mental illness compounded by his back pain," from 2011 to the then-present.  (AR 99).  In her professional opinion, Bruzzese had suffered for years from ailments such as "depression and anxiety, panic, PTSD symptoms" that were

inextricably linked to a childhood trauma and his physical issues, as "pain affects depression and depression affects pain." (AR 98-99). The ALJ noted that the extreme and marked limitations N.P. Thompson identified in her mental health evaluation in 2011 were not supported by her contemporaneous treatment notes, which had not been provided prior to the 2011 Decision but were produced in connection with the 2019 hearing. (AR 103, 219). When questioned by Bruzzese's counsel, N.P. Thompson testified to Plaintiff's inability to maintain relationships and the difficulty he would have interacting with a boss or with coworkers. (AR 111).

Dr. Murray testified that his opinion in 2011 that Bruzzese was "totally and permanently disabled" had not changed up through the present. (AR 113-14). Dr. Murray further stated that Bruzzese would only be able to sit comfortably for less than an hour and could not sit for six hours of an eight-hour workday on a consistent basis. (AR 116-117). In Dr. Murray's view, sitting would accelerate Plaintiff's deterioration because it requires "the most pressure . . . on the disc space" where Plaintiff already has permanent damage. (AR 117). When asked whether Plaintiff could perform a sedentary job where he could alternate sitting and standing, Dr. Murray replied it would be "hard to say" and would depend on how much concentration the task required because the pain he would experience would affect his concentration. (AR 117-18).

Dr. Murray did not say, and was not asked, either by the ALJ or by Bruzzese's counsel, if he was aware of Bruzzese's physical activities as described in

the CDI Report and whether they affected his opinions regarding Bruzzese's disability and functional limitations.

Dr. Wilkie testified that Bruzzese was "not that depressed initially" when she began seeing him and his then-wife for couples counselling in December 2012. (AR 122-23). He only became extremely depressed when he was unable to see his children and the judges in his divorce case refused to enforce their visitation orders. (AR 126).[8] This escalated to the point where Dr. Wilkie "had to talk [Bruzzese] out of killing himself over quite a long period of time." (*Id.*). Dr. Wilkie further testified that Plaintiff's depression "had gone on for so long and had been so severe" that he has not been able to rebound from it. (*Id.*). When questioned by the ALJ, Dr. Wilkie testified to Plaintiff's difficulty focusing and staying on task, as well as his inability to consistently show up to work five days a week. (AR 127-28). Based on her treatment and diagnosis, Bruzzese was not able to perform any gainful employment. (AR 124).

Finally, the ALJ heard testimony from the vocational expert, Carrie Anderson. In pertinent part, she testified that a person with Plaintiff's age, education, and work experience, who was unable to regularly attend work due to physical and psychiatric reasons, would not be able to perform the job of a police lieutenant as described in the Dictionary of Occupational Titles ("DOT") or any other job in the national economy on a fulltime basis. (AR 134). Asked by the ALJ

---

[8] While Dr. Wilkie did not pinpoint when this occurred, the court did not issue its judgment of divorce and custody award until December 30, 2014. *See Bruzzese v. Bruzzese*, 152 A.D.3d 563, 563, 61 N.Y.S.3d 18 (2d Dep't 2017).

whether there was a job code in the DOT for an integrity control officer for the police, Bruzzese's last position with the NYPD, Anderson said that there was not and that it falls under the category of "police officer."  (AR 132-33).

### 7.    The 2019 Decision

At the outset of his decision dated December 27, 2019, ALJ Katz found that the reopening of Plaintiff's case following the CDI Report was justified due to "fraud or similar fault."  (AR 217-20; *see* 20 C.F.R. §§ 404.987 & 404.988 (providing that SSA may reopen a disability determination of its own initiative at any time if the decision "was obtained by fraud or similar fraud")).

In particular, ALJ Katz listed five categories of evidence that could be properly viewed as "fraud" or "similar fault" within the meaning of SSA regulations: (1) as of the 2011 hearing, Plaintiff disclosed only one job in the last fifteen years before December 31, 2008, *i.e.*, a "police officer," but at his second hearing, he testified to also being "a police lieutenant" (with potentially more transferable skills) and "an integrity control officer" (a mostly sedentary job)[9]; (2) Bruzzese testified at the 2011 hearing that, due to severe pain he experienced while sitting, he was only able to drive short distances, whereas at the 2019 hearing he admitted taking a six-day, more than 1,000-mile road trip with his children in August 2010; (3) Bruzzese admitted for the first time, at the 2019 hearing, to being the coach of his son's little league team, rather than merely a spectator as he testified in 2011;

---

[9] Contrary to the ALJ's statement, Bruzzese had testified at the 2011 hearing that he held the position of police lieutenant.  (AR 176-77).  Indeed, the ALJ's 2011 Decision expressly refers to his "past relevant work as Police Lieutenant."  (AR 203).  However, Bruzzese did not mention in his testimony or his Disability Report his position as an integrity control officer in 2018.

(4) Bruzzese failed to submit 117 pages of contemporaneous treatment notes from N.P. Thompson in connection with the 2011 hearing; and (5) Bruzzese failed to disclose in his original Function Report or in his Work Activity Report that he started an investigation business in 2010 or that he did some investigative work for Diego Rivera. (AR 218-20). This evidence, the ALJ further stated, "also raise[d] overall credibility issues." (AR 220).

In light of this finding, ALJ Katz turned to his re-evaluation of Bruzzese's claim for disability benefits. At step one, the ALJ again found that Plaintiff had not engaged in substantial gainful activity during the period between his alleged onset date (December 31, 2008) through his date last insured (December 31, 2014). (AR 222). At step two, ALJ Katz found that Plaintiff had the following severe impairments: "a back impairment, a depressive disorder, an anxiety disorder and a post traumatic stress disorder (PTSD)." (*Id.*). At step three, the ALJ found that Plaintiff's back impairment did not meet or exceed the severity of any of the definitions under Listing 1.04 (disorders of the spine). (AR 223). He likewise found that Plaintiff's mental impairments did not meet any of the Listings for mental disorders. (*Id.*).

In analyzing Plaintiff's RFC, the ALJ first found, with respect to Plaintiff's physical impairments, that the evidence showed Bruzzese was "at all relevant times more-than-capable of performing work at the sedentary exertion level." (AR 225). In making this finding, the ALJ relied, *inter alia*, on the August 2010 long-distance trip Plaintiff took with his young children and the fact that he served as his son's

baseball coach from 2009 to 2011.  (*Id*.).  In light of those activities, the ALJ ascribed only "minimal evidentiary weight" to Dr. Murray's and Dr. Zucker's opinions that Bruzzese could not sit or stand for prolonged periods.  (AR 226).

Next, with respect to Plaintiff's mental impairments, the ALJ found that Plaintiff could meet "the basic mental demands of competitive work" because he could understand instructions, respond to supervision, and deal with changes in a routine work setting.  (AR 229).  Among other things, the ALJ cited: (1) N.P. Thompson's contemporaneous treatment notes, which showed that Plaintiff was mostly dealing with marital issues and had "no work-related deficits in mental functioning during the period at issue," contrary to the "check off" forms she submitted back in 2011 for the purpose of helping Plaintiff with his disability claim; (2) Plaintiff inconsistently "claiming to be mentally debilitated in his presentation to the SSA while claiming to be 'mentally fit' for child custody" purposes in his presentation to the court presiding over his divorce proceeding; and (3) Dr. Wilkie's failure to identify exactly when Plaintiff's mental health had deteriorated post-2008.  (AR 227-29).

At step four, based on his RFC assessment, the ALJ found that Bruzzese was "capable of performing past relevant work as an integrity control officer," which the ALJ described as essentially a sedentary job.  (AR 229-30).  This was so even though the vocational expert was unable to find a specific classification for the occupation of integrity control officer in the DOT.  (AR 230).  In the alternative, the ALJ found at step five that considering Plaintiff's age, education, work experience, and RFC, he

could perform other jobs existing in significant numbers in the national economy.
(AR 230-31).  In sum, then, Plaintiff was not disabled.  (AR 231).

### 8.   Appeals Council Remand

Plaintiff appealed the 2019 Decision to the Appeals Council.  (*See* AR 453).
In a decision dated October 30, 2020, the Appeals Council vacated the 2019 Decision
and remanded the case for resolution of the following deficiencies in the ALJ's
analysis: (1) the ALJ failed to provide a rationale as to what parts of the record
formed the basis for the ALJ's conclusion about the severity of Plaintiff's mental
impairments; (2) the ALJ did not "establish the claimant's specific work-related
abilities" in his RFC assessment, particularly in view of the ALJ's finding that
Plaintiff had moderate difficulties in maintaining concentration, persistence, and
pace; and (3) the ALJ did not explain how Plaintiff was capable of performing his
past relevant work as an integrity control officer (a skilled supervisory position) or
other semiskilled or skilled positions in the national economy given the prior
finding of severe mental impairments.  (AR 240-43).

On remand, the Appeals Council required the ALJ to (1) further evaluate
Plaintiff's mental impairments; (2) give further consideration to the claimant's
maximum RFC and "provide [a] rationale with specific reference to evidence in the
record"; (3) give further consideration to whether Bruzzese was "capable of
performing his past relevant work"; and (4) if warranted, "obtain supplemental
evidence from a vocational expert to clarify the effect of the assessed limitations on
the claimant's occupational base."  (AR 242).  Towards the end of the remand order,

the Appeals Council, noting that ALJ Katz had heard the case twice, directed that the case be "assigned to another Administrative Law Judge" for Plaintiff's third hearing. (*Id.*).

### 9.    2021 Proceedings before ALJ Stacchini

#### a.  Submission of Evidence on Plaintiff's Behalf

Following the remand order, and in advance of the hearing before ALJ Stacchini, Plaintiff submitted various letters of support from family members, all of which were sworn before a notary. For example, Plaintiff's sister, a psychologist, shed more light on the severity of her brother's depression and his physical limitations. Specifically, she detailed making unannounced visits to Plaintiff's home to help him with labor-intensive tasks such as cooking, and to monitor his suicidality. (AR  988-89). Moreover, two of Plaintiff's adult children submitted letters describing in detail how their mother's vendetta against their father has, for years, negatively impacted his mental health. (AR 970-72, 974-75). These letters confirmed the intense pain their father experienced on the family trip to Busch Gardens discussed in the CDI Report. (*See id.*).

Plaintiff also submitted letters of support from associates familiar with the allegations in the CDI Report. These included, *inter alia*, a letter from Diego Rivera stating that it is "totally false" that Bruzzese was a partner in a private investigation business (AR 990), and statements from various individuals averring that Plaintiff performed little or no manual labor on their homes. (*See, e.g.*, AR 977, 978, 979, 982). One of the letters denying the allegations came from the brother of

Bruzzese's ex-wife, an NYPD lieutenant commander.  (AR 977).  Another letter came from Darrin Villegas, who co-coached Bruzzese's son's little league team.  (AR 969).  According to Villegas, only he and one other coach tended to the physical aspects of Plaintiff's coaching roles, while Plaintiff limited himself to non-physical activities, such as giving instructions to disengaged players.  (*Id.*).

In addition to these letters, Bruzzese submitted a Medical Source Statement from Dr. Murray, confirming his diagnosis of Bruzzese's lumbar radiculopathy and disc collapse and setting forth his opinions that Bruzzese suffers from "constant 10/10" back pain, is unable to sit or stand/walk for more than two hours during an 8-hour workday, and "is totally and permanently disabled."  (AR 1982-85).

Bruzzese also submitted a Mental Impairment Questionnaire, and accompanying addendum, from Dr. Wilkie.  (AR 2214-24).  These materials generally confirmed Dr. Wilkie's diagnosis of Bruzzese's mental impairments and her assessment of his functional limitations, and also noted that in January 2021 he admitted himself to the hospital because he was in danger of committing suicide.  (AR 2221, 2223).  Dr. Wilkie stated that Bruzzese had been suffering from major depression "for many years," but did not indicate when it began.  (AR 2223).

### b.  The Hearing

Plaintiff initially appeared for a hearing before ALJ Stacchini on September 21, 2021, but the hearing was adjourned to October 21, 2021 because Plaintiff's counsel was still weighing which witnesses to call.  (AR 140-53).  At the October 21,

2021 hearing, Plaintiff's counsel did not call any additional witnesses aside from Plaintiff. A different vocational expert, Jeroen Walstra, also testified. (AR 2255).

ALJ Stacchini's examination of Plaintiff was extensive. To start, the ALJ questioned Plaintiff about his responsibilities in his last job with the NYPD as an integrity control officer on limited duty. Plaintiff described activities such as processing parking passes for officers, reviewing overtime reports, and attending roll calls. (AR 2277-80). He said despite his role of having been "the disciplinarian," he had no problems getting along with his co-workers and superiors. (AR 2280-81). Bruzzese said he worked overtime during the year he served as an integrity control officer. (AR 2281). He also recapped that his retirement began solely due to his back injuries rather than his mental health. (*Id.*)

The ALJ turned to Plaintiff's physical activities as outlined in the CDI Report. Plaintiff characterized his involvement as a little league coach as limited in that his assistant coaches "did the physical part" (AR 2288-90), claimed he had not gone fishing after having surgery (AR 2293-95), and reiterated that, during his 2010 trip with his children down south, took repeated breaks due to his back pain (AR 2997-2301). Plaintiff further testified that he went on rides at amusement parks in 2015 because it was a rare opportunity to spend time with his children (who were then living with his ex-wife) and that doing so caused his back immense pain, to the point where he started vomiting. (AR 2304-05).

With respect to his serving a subpoena and conducting surveillance for Diego Rivera, Plaintiff denied receiving any compensation from Rivera and described

them as favors he did for a friend.  (AR 2308-09).  These activities had nothing to do with the private investigation firm Plaintiff incorporated, which he reiterated did no business.  (AR 2306).  As for home renovations, Plaintiff admitted that, at his ex-wife's insistence, he installed a microwave and a dishwasher sometime between 2010 and 2012, but claimed a friend helped him do so and that his physical exertion was limited.  (AR 2310-12).  He also did some "light spackling" and some painting, which he said he did an hour at a time because his back hurt.  (AR 2313-14).  Similarly, he admitted installing a vanity, tile, sink, and light fixtures in the bathroom, but described these tasks as relatively simple.  (AR 2314-16).  He sometimes removed snow at the house, and reseeded the grass while riding his lawnmower.  (AR 2316-17).

Bruzzese clarified that between 2008 and 2014, he experienced two types of pain: one that lingered without easing, and another that was sharp and would shoot towards his extremities.  (AR 2326).  The pain made it hard for him to sit or stand for a long time.  (*Id.*).  He did not have fusion surgery because Dr. Murray was hesitant to recommend surgery due to Plaintiff's relatively young age.  (AR 2325-26).

Turning to Plaintiff's mental health symptoms during the relevant period, Plaintiff recounted a traumatic childhood incident, and how devastated he was when he was unable to see his children and a judge ruled against him during his divorce case.  (AR 2329-30).  Asked to focus on the period from 2008 to 2014, Plaintiff told ALJ Stacchini that after his retirement from the NYPD, his mental

health "just snowballed and snowballed."  (AR 2330-32).  He emphasized the
baseless accusations and abusive emails sent to him by his ex-wife.  (AR 2332-34).
In the beginning of 2021, he was admitted to the hospital for suicidal thoughts.  (AR
2341).  That hospitalization lasted for two weeks.  (AR 1992-2001).

To finish the hearing, Walstra, the vocational expert, testified.  (AR 2255,
2344).  According to Walstra's testimony, Plaintiff's last job as an integrity control
officer with the NYPD would be classified as a "program manager" position in the
DOT and was sedentary.  (AR 2343).  Assuming a person of Plaintiff's age,
education, and work experience who is able to perform the full range of light work,
standing and walking for up to six hours and sitting for up to six hours with regular
breaks, Walstra testified that such a person could perform sedentary work as a
program manager.  (AR 2344).  Further, the vocational expert testified that such a
person could be a document preparer, a callout operator, and a tube operator, all
sedentary jobs in the national economy.  (AR 2345).

### 10.    The 2021 Decision

In a decision dated December 15, 2021, ALJ Stacchini denied Plaintiff's claim
for benefits.  (AR 13-21).  The ALJ began his decision by finding, as ALJ Katz had,
that reopening the 2011 Decision was justified on the basis of "fraud" or "similar
fault."  (AR 17-18).  ALJ Stacchini's rationale for this finding overlapped in
significant part, but not entirely, with that of ALJ Katz.  Among other things, ALJ
Stacchini cited additional evidence showing that Bruzzese "consistently performed
extensive activities" that were not previously disclosed, such as mowing his lawn

with a sitting lawnmower, performing renovation work to his house, and traveling to Washington and South Carolina in August 2010. (*Id.*).[10]

At step one of the disability analysis, in line with the two prior decisions, ALJ Stacchini found that Bruzzese had not engaged in substantial gainful activity from December 31, 2008 through December 31, 2014. (AR 20). At step two, the ALJ identified only *physical* severe impairments: lumbar degenerative disc disease and radiculopathy. (*Id.*). However, he found at step three that these physical impairments did not (standing alone or in combination) rise to the level of severity of one of the listed impairments in the applicable regulations. (AR 23).

In addressing Bruzzese's medically determinable mental impairments (*i.e.*, bipolar disorder, depressive disorder, and anxiety disorder), the ALJ found at step two (contrary to the two prior decisions) that those impairments "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities" and were therefore non-severe. (AR 21). In making that finding, the ALJ evaluated each of the four specific areas of mental functioning, known as the "paragraph B" criteria, set forth in 20 C.F.R. § 404, subpt. P, app. 1. (AR 21-22). He found that Bruzzese had no limitation in understanding, remembering, or applying information, and only mild limitations in social functioning, maintaining concentration, persistence or pace, and adapting or managing himself. (*Id.*).

---

[10] ALJ Stacchini did not mention other matters relied on by ALJ Katz, such as Bruzzese's failure to disclose N.P. Thompson's progress notes and his formation of an investigation business. He also incongruously cited Bruzzese's trip to Busch Gardens in 2015, even though that trip post-dated the 2011 Decision by nearly four years. (*See* AR 18).

However, the ALJ did consider Bruzzese's mental health impairments in assessing Bruzzese's RFC. (AR 23-24).

At step four, the ALJ first found that Plaintiff had the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b) within certain prescribed limits. (AR 23). Specifically, the ALJ found that Bruzzese could "stand/walk 6 hours, sit six hours with regular breaks of 15 minutes in the morning and afternoon and 30 minutes to an hour midday," but was limited to "occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs, with no climbing ladders ropes or scaffolds." (*Id.*) While noting that "[d]ebilitating symptoms associated with psychiatric and lumbar conditions are alleged" since the disability onset date, the ALJ concluded that, for the period 2008 through 2014, there was "no medical evidence to demonstrate restrictive symptoms or functional limitations that would have precluded all work activity." (AR 25).

To arrive at this conclusion, the ALJ determined that the opinions of Bruzzese's two treating physicians—Dr. Murray and Dr. Zucker—were not entitled to "controlling weight" and he instead gave them "little weight." (AR 28-29). He found the opinions were not supported by, and were inconsistent with, the other evidence in the record. (*Id.*). First, the opinions were inconsistent with the doctors' own progress notes, which, as assessed by the ALJ, showed "no more than mild lower extremity weakness and restricted lumbar motion" as well as "minimal treatment and either normal or close to normal strength with other normal findings after discectomy" (in the case of Dr. Murray) and "[did] not identify deficits in gait

34

or other debilitating examination finding through December 2014" (in the case of Dr. Zucker).  (*Id.*).  Second, the ALJ found the opinions inconsistent with the "well supported opinion" of the state agency physician who stated that Plaintiff could perform a range of light work.  (AR 29).  Third, the ALJ found the opinions to be inconsistent with evidence of Plaintiff's "activities of daily living including home renovation activities, coaching his son's baseball team and attending games and performing light household chores."  (*Id.*).

Similarly, the ALJ ascribed "little weight" to the opinions of N.P. Thompson and Dr. Wilkie as to Plaintiff's mental impairments.  In the ALJ's view, N.P. Thompson's opinions about plaintiff's "'marked'" and "'extreme'" limitations in mental functioning were belied by her own contemporaneous treatment records, which showed that Bruzzese "demonstrated good eye contact and intact memory, concentration insight and judgment" as well as Global Assessment of Functioning ("GAF") scores "consistently indicating generally mild symptoms over an extended period of time."  (*Id.*).  The ALJ found Dr. Wilkie's opinion about Plaintiff's "marked" psychiatric limitations to be similarly flawed in part for the same reasons, and because Dr. Wilkie did not relate these restrictions to any specific time period and testified at Plaintiff's divorce trial that they did not limit his functioning.  (AR 29-30).

At the same time, the ALJ assigned "[g]reat weight" to the state agency physician's opinion, even though that physician did not examine Bruzzese.  (AR 30). The state agency physician's opinion, according to the ALJ, was "formulated based

upon a thorough review of the available documentary evidence" and "consistent with additional records subsequently obtained." (*Id.*).  Among other things, it was consistent with the fact that Bruzzese "did not have any need for steroid injections or further surgery" and with his "activities such as attending his children's events; performing child care; going on multiple roller coasters; being independent with personal care and cleaning his home; driving; and home improvements such as tiling, installing appliances, electric work, using a nail gun to hang doors, and installing a vanity." (*Id*)  The ALJ also assigned "some weight" to Dr. Philip's findings that Plaintiff had only "moderate limitations to heavy lifting, carrying, bending, prolonged standing, and walking." (AR 26).

The ALJ also discussed, but gave little weight to, the multiple letters submitted on Plaintiff's behalf, reasoning that, to the extent they implied that Plaintiff could not engage in work activity, "they are not consistent with records that show during the relevant period under consideration, the claimant remained physically active despite his underlying back issues." (AR 30).  Here again, the ALJ cited, *inter alia*, Bruzzese's testimony about his activities at the 2021 hearing and in his divorce trial, which "support an ability to perform a range of work consistent with the residual function capacity" assessed by the ALJ.  (AR 31).

In light of his RFC assessment, the ALJ found at step four that Plaintiff was able to perform past relevant work as an "ICO [integrity control officer] program manager," as such work was sedentary and the vocational expert at the 2021 hearing testified that an individual with Bruzzese's age, education, work

experience, and RFC could perform such work.  (AR 31-32)  In addition, the ALJ

concluded at step five that there were other jobs that existed in significant numbers

in the national economy that Bruzzese could have performed, such as document

preparer, operator, and call out operator.  (AR 32)  In sum, then, the ALJ found

that Bruzzese was not disabled at any time between December 31, 2008 and

December 31, 2014.  (AR 33)

**LEGAL STANDARDS**

**A.    Judicial Review of the Commissioner's Decision**

An individual may obtain judicial review of a final decision of the

Commissioner "in the district court of the United States for the judicial district in

which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine

whether the Commissioner's final decision applied the correct legal standards and

whether the decision is supported by "substantial evidence."  *Butts v. Barnhart*, 388

F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (cleaned up).

The substantial evidence standard is a "very deferential standard of review."

*Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court "must be

careful not to substitute its own judgment for that of the Commissioner, even if it

might justifiably have reached a different result upon a *de novo* review."  *DeJesus v.*

*Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949

37

F.2d 57, 59 (2d Cir. 1991)) (cleaned up).  "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Conklin v. Kijakazi*, No. 21 Civ. 8486 (JLC), 2023 WL 104829, at *7 (S.D.N.Y. Jan. 5, 2023) (quoting *Brault*, 683 F.3d at 448).

In weighing whether substantial evidence supports the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted).  Based on this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted).

## B.    Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental

impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Social Security Administration has outlined a five-step, sequential evaluation process to determine whether a claimant is disabled." *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (cleaned up); *see* 20 C.F.R. § 404.1520(a)(4). The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step.  *Manzanares v. Comm'r of Soc. Sec.*, No. 22 Civ. 1898 (SN), 2023 WL 4350651, at *4 (S.D.N.Y. July 5, 2023).  The Second Circuit has described the five-step process as follows:

> *First*, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner *next* considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the *third* inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the *fourth* inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ["RFC"] to perform her past work. *Finally*, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (emphasis added); *see* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

The claimant bears the burden of proof as to steps one through four; the Commissioner bears the burden as to step five. *See Manzanares*, 2023 WL 4350651, at *4 (citing *Selian*, 708 F.3d at 418).

## C.    Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Conklin*, 2023 WL 104829, at *9 (citation omitted); *see* 20 C.F.R. §§ 404.1527(c), 416.927(d).  Not every medical opinion is assigned the same weight, however. *Wasserman v. Kijakazi*, No. 20 Civ. 3482 (VB) (AEK), 2022 WL 2532181, at *13 (S.D.N.Y. Mar. 17, 2022).  For claims filed before March 27, 2017, "the opinions of a treating source as to the nature and severity of a claimant's impairments are generally, but not always, entitled to 'more weight' relative to those from other treatment providers." *Id.* (citing 20 C.F.R. § 404.1527(c)(2) and *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995)).[11]  Such opinions are given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record. *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).  Conversely, opinions from treating

---

[11] This so-called "treating physician rule" was modified for social security disability claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 404.1520c.  Because Plaintiff filed his claim in 2010, the Court applies the treating physician rule and other rules for evaluating opinion evidence as set forth in 20 C.F.R. § 404.1527.

sources need not be given controlling weight where they are contradicted by, or inconsistent with, other substantial evidence in the record. *Id*.

When a treating source's opinion is not given controlling weight, the ALJ must still consider various, non-exclusive factors in determining the amount of deference to assign to that opinion. These factors include: (i) whether the treating source examined the claimant; (ii) the length, nature, and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion ("supportability"); (iv) the extent to which the opinion is consistent with the record as a whole ("consistency"); (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ. *See* 20 C.F.R. §§ 404.1527(c)(1), (c)(2)(i)-(ii), (c)(3)-(c)(6); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). While the ALJ need not provide a "recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear," *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013), the ALJ must "comprehensively set forth reasons for the weight" ultimately assigned to the treating source, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

At both steps—in deciding whether to give controlling weight to a treating source's opinion and, if not, in deciding what weight to give the opinion—"the ALJ must 'give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] [a claimant]'s treating source's [medical] opinion.'" *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

"'An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case.'" *Conklin*, 2023 WL 104829, at *10 (quoting *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020)). "However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the 'application of the correct legal principles to the record could lead only to the same conclusion.'" *Id.* (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

## D.    Evaluation of Mental Impairments

When an alleged mental impairment is at issue, the regulations mandate use of a "special technique" in evaluating the severity of the impairment at steps two and three.  20 C.F.R. § 404.1520a(a); *see Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  Under this technique, the Commissioner must "'rate the degree of [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis.'" *Rosario v. Kijakazi*, No. 20 Civ. 5490 (JPC) (BCM), 2022 WL 875925, at *11 (S.D.N.Y. Mar. 15, 2022) (quoting 20 C.F.R. § 404.1520a(c)(2)), *adopted by* 2022 WL 976879 (S.D.N.Y. Mar. 31, 2022).

The special technique first requires the Commissioner "to assess the claimant's degree of functional limitation resulting from a mental impairment in four 'broad functional areas' identified in the 'paragraph B' of the adult mental disorders listings." *Nunez v. Comm'r of Soc. Sec.*, No. 22 Civ. 9100 (MKV) (SDA), 2024 WL 474045, at *20 (S.D.N.Y. Jan. 8, 2024) (citing 20 C.F.R. § 404.1520a(c)(3)).

Those four functional areas are the claimant's ability to (1) "[u]nderstand, remember, or apply information;" (2) "interact with others;" (3) "concentrate, persist, or maintain pace;" and (4) "adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). The Commissioner uses a five-point scale to rate the degree of limitation in each area: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4).

These ratings are used at step two to determine whether the claimant's mental impairment is severe. If the degrees of limitation are considered to be "none" or "mild," the Commissioner "will generally conclude" that the claimant's impairment "is not severe." *Id.* 404.1520a(d)(1). However, "those rated as 'moderate,' 'marked,' or 'extreme' will qualify as 'severe' under step two, thus requiring [the ALJ] to proceed to the third step in the sequential process." *Schafenberg v. Saul*, 858 F. App'x 455, 456 (2d Cir. 2021).

To meet or medically equal a listed mental impairment at step three, a claimant must satisfy the "paragraph A" criteria for that disorder, that is, "the medical criteria that must be present in [the claimant's] medical evidence," as well as *either* the "paragraph B" criteria *or* the "paragraph C" criteria. *Rosario*, 2022 WL 875925, at *11 n.9 (citing 20 C.F.R. Part 404, subpt. P, app. 1 § 12.00A(2)(a)-(c)). To satisfy the "paragraph B" criteria, the claimant must demonstrate "an extreme limitation of one, or a marked limitation of two," of the same four broad functional areas described in 20 C.F.R. § 404.1520a(c)(3). *Id*. (citing, as an example, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04B). To satisfy the "paragraph C" criteria, the

claimant must demonstrate that her mental disorder is "serious and persistent." *Id.* (citing, as an example, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04C).

## DISCUSSION

Bruzzese's motion advances three main arguments.[12]  In order, these are: (1) the ALJ failed to properly weigh the medical evidence of Bruzzese's treating physicians, Drs. Murray and Zucker, and thus violated the treating physician rule; (2) the ALJ similarly failed to properly weigh the mental health treatment evidence and thus erroneously found Bruzzese's mental impairments to be non-severe; and (3) the ALJ did not properly evaluate Bruzzese's own testimony.[13]

## A.    The ALJ Erred in Deciding What Weight to Give to the Opinions of Bruzzese's Treating Physicians

Bruzzese's primary argument is that the ALJ failed to properly apply the treating physician rule when weighing medical opinion evidence to determine his RFC.  According to Plaintiff, the ALJ should have given controlling weight to the opinions of Drs. Murray and Zucker because no substantial evidence contradicted those opinions.  (Pl. Br. at 31-38).  At a minimum, Plaintiff

---

[12] Bruzzese does not challenge the ALJ's decision to reopen the 2011 Decision on the basis of "fraud" or "similar fault."  The Court, therefore, makes no determination as to whether the evidence justified that finding. *See Barone v. Bowen*, 869 F.2d 49, 51-52 (2d Cir. 1989) (to justify reopening of prior SSA determination of disability, there must be substantial evidence showing either "fraudulent intent" or that claimant "knowingly did something wrong") (cleaned up).

[13] In his moving brief, Plaintiff also argued that the record was incomplete, warranting a remand, because it did not include Bruzzese's and the vocational expert's testimony at the October 21, 2021 hearing.  (Pl. Br. at 48-51).  However, although not part of the original administrative record, the hearing testimony was included in a supplement to the administrative record filed on June 12, 2023, prior to the time Bruzzese submitted his brief.  (Dkt. No. 21).  Plaintiff abandoned this argument on Reply.

contends, the ALJ erred in assigning the doctors' opinions only "little weight." (*Id*. at 38).

For his part, the Commissioner recounts much of the same evidence that the ALJ relied on to afford Drs. Murray and Zucker's opinions little weight and argues that Plaintiff cannot sidestep the deferential substantial evidence standard by characterizing his disagreement with the ALJ's assessment as legal error.  (Gov. Br. at 6-16).

As an initial matter, the Court agrees that the ALJ was not required to defer to Dr. Murray's conclusion that Bruzzese was "totally permanently disabled."  (AR 29, 1090-91, 1093).  "It is well established that a legal conclusion that the claimant is 'disabled' or 'unable to work' is not controlling because such opinions are reserved for the Commissioner."  *Galente v. Acting Comm'r of Soc. Sec.*, No. 16 Civ. 9981 (KHP), 2018 WL 852113, at *16 (S.D.N.Y. Feb. 12, 2018) (cleaned up); *see* 20 C.F.R. § 404.1527(d)(1).

But Dr. Murray's opinions extended far beyond this conclusion.  He diagnosed Bruzzese with "lumbar disc disease with persistent painful radiculopathy."  (AR 1091, 1093).  Based on this diagnosis, Dr. Murray opined that Bruzzese could not lift more than five pounds and could not sit or stand for prolonged periods of time.  (*Id*.).  He further opined that Bruzzese could not sit comfortably for more than an hour or for six hours total during an eight-hour workday (AR 116-17), an opinion corroborated in substance by another treating physician, Dr. Zucker.  (AR 1098 (assessing that Bruzzese could neither sit nor

stand for more than two hours in an eight-hour workday)). These are all medical opinions due deference under the treating physician rule. *See* 20 C.F.R. § 404.1527(a)(1) (defining medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions").

If those medical opinions are given controlling weight, then Bruzzese did not have the RFC to perform light work as determined by the ALJ. (*See* AR 23 (finding Bruzzese had the RFC to perform light work such that "he could stand/walk 6 hours [and] sit six hours with regular breaks of 15 minutes in the morning and afternoon and 30 minutes to an hour midday")).[14] This would mean he would have been unable to perform the "sedentary" jobs that the AR found he could perform, all of which primarily involve sitting. (AR 31-32; *see* 20 C.F.R. § 404.1567(a) ("a sedentary job is defined as one which involves sitting")). The relevant question is whether the ALJ erred in the weight he gave to these medical opinions.

As noted above, the ALJ denied controlling weight, and instead gave little weight, to Drs. Murray and Zucker's opinions based on the following categories of evidence the ALJ found to be inconsistent with those opinions: (1) the doctors' own progress reports and treatment notes; (2) the contrasting opinions of the

---

[14] "Light work" under the SSA regulations involves frequent lifting or carrying of up to ten pounds and "requires a good deal of walking or standing" or "involves sitting most of the time." 20 C.F.R. § 404.1567(b).

consultative examiner and the state agency physician; and (3) the evidence of

Plaintiff's physical activities that emerged from the CDI Report. (AR 23-31).

While the ALJ's discussion of the evidence in his RFC evaluation was quite

thorough, his analysis was seriously flawed in several respects and falls short of

the "good reasons" needed for an ALJ either to deny controlling weight to a

treating physician's opinion or to give that opinion only little weight.

### 1.    Medical Records

The ALJ described Dr. Murray's opinions as "inconsistent" with the

doctor's own treatment notes, which the ALJ characterized as showing "no more

than mild lower extremity weakness and restricted lumbar motion, but no other

weakness, ongoing sensory deficits, or gait disturbance" as well as "minimal

treatment" and "normal findings after discectomy" during the relevant period.

(AR 28). The ALJ's determination, however, lacks sufficient support in

Plaintiff's medical records and the applicable case law.

For example, the ALJ highlighted a February 5, 2009 visit (more than a

year before Bruzzese filed for DIB) where Dr. Murray observed Bruzzese had

"no back pain with straight leg raising" and "mild degenerative disease, worse

at the L4-L5 and L5-S1 level." (AR 25, 225, 1087). Although the ALJ stated

that "[e]xaminations through 2009 reflected consistent findings," the record

indicates otherwise. (AR 25). As ALJ Katz noted in his 2019 Decision (AR 225),

at Bruzzese's very next visit on May 1, 2009, Dr. Murray found that straight leg

raising *did* "cause back pain" and that MRI imaging showed central, left and

midline disc herniation and "a degenerative disc bulging at L5-S1," prompting Dr. Murray to consider fusion surgery or disc replacement. (AR 225, 1088). Dr. Murray's subsequent reports recorded positive straight leg raise results on each of Bruzzese's next four visits in 2009 and 2010.[15] *See Avila v. Comm'r of Soc. Sec.*, No. 20 Civ. 1360 (ER) (DF), 2021 WL 3774317, at *23 (S.D.N.Y. Aug. 9, 2021) ("It is well settled that an ALJ's good reason to discredit a treating physician's opinion cannot rest on mischaracterized or cherry-picked evidence.") (cleaned up), *adopted by* 2021 WL 3774188 (S.D.N.Y. Aug. 25, 2021).

The ALJ's decision went on to characterize a March 2010 MRI as documenting a "significant regression of the left paracentral disc herniation" and "no overt compression or compromise of the descending S1 nerve root." (AR 25). But the MRI report describes "significant regression in the left paracentral disc herniation . . . *with some persistent posterior disc protrusion*" (AR 1416; emphasis added), and Dr. Murray read the MRI as showing "some compromise on the S1 root" and warranting a treatment plan including physical therapy and "chronic pain management." (AR 1091). *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("it is well-settled that the ALJ cannot arbitrarily substitute his own judgment or competent medical opinion . . . [and] he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him") (cleaned up).

---

[15] In similar fashion, in describing Dr. Zucker's records, the ALJ highlighted a March 2011 report noting that Bruzzese was in "good health, without any complaints and was in zero-out-of-10 pain." (AR 25). But as Plaintiff points out (Reply 2), this report is from a visit to a *urologist*, and there is no reason to believe the urologist was measuring Bruzzese's back pain. (AR 1111-13).

The ALJ also misread the record in describing Bruzzese's treatment for his back pain as merely "minimal" and "conservative."  (AR 28, 31).  The ALJ emphasized that after his 2007 surgery until the end of 2014, Bruzzese "did not require injections."  (AR 28; *see* AR 30 ("since his 2007 discectomy, the claimant did not have any need for steroid injections")).  In fact, the medical records show that in October 2010, Dr. Murray decided to "try a series of lumbar epidural injections" and Bruzzese received epidural injections.  (AR 1092-93; *see* AR 181 (Bruzzese's testimony at the 2011 hearing that he received epidural injections about a year earlier)).  The ALJ's assessment also fails to account for the fact that Bruzzese was prescribed opioid medications, such as Vicodin, Hydrocodone, and Percocet, to manage his pain, as well as physical therapy.  (AR 180-81, 1059, 1106-08).  *See Messina v. Comm'r of Soc. Sec.*, 747 F. App'x 11, 16 (2d Cir. 2018) (noting that treating physician's opinion that plaintiff could not sit for more than one to three hours during an 8-hour workday was consistent with his "prescription of opioid pain medications for over a year"); *Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 249-50 (E.D.N.Y. 2020) (ALJ erred in characterizing plaintiff's treatment as "conservative" where it consisted of opioid pain medication, physical therapy, and epidural steroid injections).

Of further concern is the ALJ's emphasis on infirmities that Plaintiff lacked, such as gait abnormalities or ongoing sensory deficits beyond Plaintiff's extremities.  (AR 28).  [I]t is improper for an ALJ to discount a treating physician's opinion based on an absence or omission of symptoms or evidence."

*Molina v. Kijakazi*, No. 21 Civ. 3869 (JLC), 2022 WL 16946823, at *10 (S.D.N.Y.

Nov. 15, 2022); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (finding

that an ALJ's attachment of "such significance" to a treating physician's

omission to report muscle spasms was reversible error).  The ALJ did not

explain how the absence of gait abnormalities or sensory deficits undermined

Dr. Murray's opinions about the severity of Bruzzese's back pain or his ability to

sit, stand, and walk in light of his diagnosed physical impairments.

### 2. The Opinions of the Consultative Examiner and State Agency Physician

The ALJ placed more weight on the findings of the consultative examiner,

Dr. Philip, than on those of Drs. Murray and Zucker.  (AR 26-27).  However, Dr.

Philip examined Bruzzese only once, on June 9, 2010 (AR 1058), in contrast to

Plaintiff's more than half a dozen office visits with Dr. Murray between 2008

and 2011.  (AR 1087-94).  Courts in this District have cautioned against reliance

on a consultative examiner's findings under similar circumstances.  *See Arzu v.*

*Saul*, No. 19 Civ. 6451 (VSB) (BCM), 2020 WL 9596205, at *2 (S.D.N.Y. Nov. 20,

2020) (remanding in part because of ALJ's reliance on consultative examiner's

findings who only saw plaintiff once); *Roman v. Saul*, No. 19 Civ. 3688 (JLC),

2020 WL 4917619, at *18 (S.D.N.Y. Aug. 21, 2020) (in light of at least eight

office visits, plaintiff's treating physician "was more likely to obtain a

longitudinal picture of [plaintiff's] condition than the consultative examiner . . .

who met [plaintiff] only once").

This case illustrates why such caution is warranted. Because Dr. Philip examined Bruzzese only once in July 2010, she could not have been aware of the series of epidural injections and the physical therapy he received afterwards. (*See* AR 1058 (Dr. Philip's stating that Bruzzese "underwent physical therapy last in 2008" and had "epidural injections prior to his [2007] diskectomy")). Nor could she have been aware of Dr. Murray and Dr. Zucker's repeated subsequent assessments that Bruzzese suffered from "persistent pain" and "chronic pain" that affected his ability to sit and required continued opioid medication.[16] Moreover, Dr. Philip could only vaguely describe Bruzzese as having "moderate limitations to heavy lifting, carrying, bending, prolonged standing and walking," with no articulated limitations on sitting (AR 1061), despite the extensive evidence that Bruzzese had at least some limitations in sitting. The ALJ did not adequately explain why he credited the consultative examiner over Bruzzese's treating physicians under these circumstances. *See Arzu*, 2020 WL 9596205, at *10, *18 (ALJ erred in crediting consultative examiner over treating physician where examiner's opinion that claimant had "moderate" limitations in his ability to stand and walk was "couched in terms so vague as to render it useless in evaluating" claimant's RFC) (cleaned up).

---

[16] Bruzzese also contends that Dr. Philip's opinion cannot constitute substantial evidence because she "was not given any of Plaintiff's treatment records or MRI results." (Pl. Br. at 35; *see* Reply at 3). The Court is unpersuaded by this argument. Dr. Philip's report specifically references the findings from Bruzzese's MRI in March 2010 and indicates a familiarity with Bruzzese's medical conditions and history that seems likely to have been based on a review of Plaintiff's medical records. (*See* AR 1058-59).

The ALJ also failed adequately to explain why he assigned "[g]reat weight" to the opinion of the state agency physician, who did not examine Bruzzese at all.  (AR 30).  One specific reason given by the ALJ for crediting the state agency physician is, as noted above, invalid: that Bruzzese "did not have any need for steroid injections."  (*Id*.).  Like Dr. Philip, the state agency physician's snapshot of Bruzzese's condition was taken more than a year before the ALJ hearing in 2011 and thus does not account for the full longitudinal record.  *See Janette G. v. Comm'r of Soc. Sec.*, No. 3:20-CV-1496 (JCH), 2022 WL 313884, at *6 (D. Conn. Feb. 2, 2022) ("Multiple courts in this Circuit have held that great weight should not be accorded to the opinion of a non-examining State agency consultant whose opinion is based on an incomplete record") (cleaned up) (collecting cases).

Further, the state agency physician stated that he disagreed with Dr. Murray's opinion because "there is no evidence of nerve compression now in the lumbar spine."  (AR 191).  Yet Dr. Murray indicated that there was "some compromise on the S1 root" and considered Bruzzese for "decompression" in 2011.  (AR 1091, 1093).  Dr. Murray consistently diagnosed Bruzzese with "radiculopathy," which "refers to any disease of the spinal nerve roots and spinal nerves."  *Agostini v. Comm'r of Soc. Sec.*, No. 13 Civ. 2175 (KAM), 2016 WL 8711392, at *4 n.9 (E.D.N.Y. Feb. 19, 2016) (cleaned up).  The ALJ *agreed* with Dr. Murray's diagnosis of radiculopathy (AR 20 (finding radiculopathy to be one of Bruzzese's severe medical impairments)), but anomalously placed

more weight on the functional assessment of the state agency physician, who did not diagnose Bruzzese with any radiculopathy.

Notably, in his 2011 Decision, ALJ Katz gave Dr. Murray's and Dr. Zucker's opinions "controlling weight" (AR 202), despite having before him the contrasting opinions of Dr. Philip and the state agency physician. There is no apparent reason based on the *medical* evidence alone why the latter opinions should now be deemed to override the former. Rather, it seems clear from ALJ Stacchini's decision that he would not have given greater weight to the opinions of Dr. Philip and the state agency physician were it not for the evidence of Bruzzese's life activities that emerged after 2011. (*See* AR 26-30). The Court now turns to a consideration of that evidence.

### 3.    Evidence of Bruzzese's Physical Activities

Much of the ALJ's rationale for assigning little rather than controlling weight to Dr. Murray's and Dr. Zucker's opinions was rooted in Bruzzese's physical activities as revealed via the CDI Report. (AR 27-31). The ALJ was correctly concerned that this evidence undermined Bruzzese's disability claim. *See, e.g.*, *Galente*, 2018 WL 852113, at *14-15 (endorsing ALJ's reliance on CDI report to affirm agency finding of non-disability).

Moreover, the ALJ did not blindly accept all the allegations in the CDI Report, especially the exaggerated and unreliable charges from Plaintiff's ex-wife and her boyfriend, who were clearly biased against Plaintiff. For example, the CDI Report indicated that Bruzzese had been gainfully employed during the

relevant period, operating a private investigation business with an estimated $34,000 in revenues and performing carpentry and construction work for others for cash payments.  (*See* AR 1195).  Those claims, however, were unsubstantiated and convincingly rebutted by Bruzzese's testimony and statements from witnesses.  (*See, e.g.*, AR 66-70; 990).  The ALJ's RFC analysis correctly does not rely on those allegations or assert that Bruzzese was surreptitiously working during the period he claimed he was disabled.

Rather, the ALJ appears to have been careful to rely only on activities that Bruzzese himself acknowledged in his sworn testimony, either at the ALJ hearings in 2019 and 2021 or during his divorce proceeding, or that were documented in photographs.  These included Bruzzese's activities with his children, including coaching his son's little league team in 2009, 2010, and 2011; the six-day trip to Washington, D.C. and South Carolina in August 2010, when he was photographed on a log flume ride; and the trip he took to Busch Gardens in Williamsburg, Virginia in 2015 (shortly after the end of the relevant period) when he was photographed laughing and smiling on at least five high intensity rollercoasters.  (AR 18, 21, 27, 30, 31).  The ALJ also relied on the evidence that Bruzzese installed kitchen appliances in his home; replaced the vanity and sink in his bathroom and performed electrical work and tiling; re-seeding his lawn and adding mulch; spackled and painted; oversaw subcontractors and day laborers perform work; and, with assistance, hung doors using a nail gun.  (*Id.*).

Evidence that Bruzzese engaged in these physical activities from time to time, however, does not necessarily mean that he possessed the RFC to sit, stand or walk up to six hours and sit up to six hours per day for a five-day workweek. *See, e.g.*, *Diana C. v. Comm'r of Soc. Sec.*, No. 19 Civ. 7474 (LGS) (GRJ), 2022 WL 1912397, at *9 (S.D.N.Y. Apr. 11, 2022) ("[p]laintiff's ability to attend to [numerous] basic activities with the support of her family does not translate into an ability to perform competitive work on a consistent basis"), *adopted by* 2022 WL 1912310 (S.D.N.Y. Jun. 3, 2022). Bruzzese's treating physicians said he did not possess that capacity, and courts have been wary about overriding medical opinions on the basis of non-medical observations of a claimant's physical activities. *See, e.g.*, *Virgil v. Saul*, No. 19 Civ. 1473 (PKC), 2020 WL 5747278, at *10 (E.D.N.Y. Sept. 25, 2020) ("The ALJ's use of non-medical, observational evidence from the CDI report to discredit the opinions of Plaintiff's treating physicians was error."); *Glessing v. Comm'r of Soc. Sec.*, No. 13 Civ. 1254 (BMC), 2014 WL 1599944, at *11 (E.D.N.Y. Apr. 21, 2024) (noting a CDI report "is not medical evidence"); *Holliday v. Colvin*, 195 F. Supp. 3d 1192, 1202 (D. Kansas 2016) (criticizing ALJ for relying more heavily on a CDI report than medical opinion evidence from treating physicians).

While certainly indicative that Bruzzese might be able to exert himself and sit and stand at levels beyond what Drs. Murray and Zucker opined, none of Bruzzese's physical activities *show* him operating with the RFC the ALJ believed he possessed. *See Virgil*, 2020 WL 5747278, at *10 ("none of Plaintiff's

activities observed by CDI investigators . . . contradict the findings of [the medical doctors] that Plaintiff cannot lift/carry more than ten pounds, sit less than four-to-six hours, and stand/walk less than two hours in an eight-hour workday"). Bruzzese offered substantial evidence, in the form of his own testimony and a plethora of letters from third-party witnesses, that he was able to perform these activities only with the assistance of others and while often experiencing excruciating pain. The ALJ gave these letters from third-party witnesses "little weight" (AR 30), and the Commissioner contends he found them "simply not credible" (Gov. Br. at 12). But each of the letters was sworn to and notarized (*e.g.*, AR 973, 976, 977, 978, 979), and the ALJ identified no reason to doubt the veracity of the witnesses' sworn factual statements.

Instead, the ALJ stated that the witnesses' statements were "not consistent" with the evidence showing that Bruzzese "remained physically active despite his underlying back issues." (AR 30). This reasoning misapprehended the import of the witness statements. The witnesses did not deny that Bruzzese had engaged in certain physical activities despite his back issues; rather, they sought to put those activities in context, in a manner that suggested Bruzzese nonetheless would be unable to manage the rigors and demands of a 40-hour workweek. *See Virgil*, 2020 WL 5747278, at *10 ("people should not be penalized for enduring the pain of their disability in order to care for themselves") (citation omitted); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("a claimant need not be an invalid to be found disabled")

(citation omitted).  The ALJ took it upon himself to make the judgment that if Bruzzese could engage in those activities, he was also capable of performing the range of light work found in his RFC evaluation.

This was error.  Crucially, the record lacks any opinion from a *medical doctor* as to whether the physical activities Bruzzese engaged in are or are not consistent with the functional limitations described by his treating physicians. At the 2019 hearing, after the CDI Report, Dr. Murray testified that he adhered to his previously rendered opinion.  (AR 113-120).  He reiterated that opinion in his 2020 Medical Source Statement.  (AR 1982-85).  This strongly suggests that Dr. Murray's opinion was unaffected by the evidence of Bruzzese's physical activities that emerged after the CDI Report.  But the Court does not know this for a fact, as Dr. Murray was never asked if he knew about those activities and if he adhered to his opinion despite those activities.

Under the circumstances of this case, it was incumbent upon the ALJ to develop the record on this point, either by putting the question to Dr. Murray, by soliciting the opinion of another medical expert, or both.  *See Virgil*, 2020 WL 5747278, at *8 (ALJ "must seek additional evidence or clarification when the report from the claimant's medical source contains a conflict or ambiguity that must be resolved") (citation omitted); *Holliday*, 195 F. Supp. 3d at 1203 (testifying physician's failure to review CDI report and be questioned about it was ALJ's error because "it is the ALJ's duty to develop the record as to all questions relevant to the issue of disability").  While Plaintiff's counsel likewise failed to examine Murray on

this topic, the ALJ's duty to develop the record exists regardless of whether Plaintiff is represented by counsel. *See Rosa*, 168 F.3d at 79 ("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel").

In short, the Court cannot, as the Commissioner urges, affirm the ALJ's disability determination on the basis of the "deferential" substantial evidence standard of review and the principle that "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." (Gov. Br. at 11) (citation omitted). Rather, as the Second Circuit has recently noted, this "principle presupposes that the ALJ has not disregarded or misconstrued relevant evidence and has not applied incorrect legal standards." *Rubin v. O'Malley*, __ F.4th __, No. 23-540-cv, 2024 WL 4258363, at *7 (2d Cir. Sept. 23, 2024).

That is exactly what happened here, as detailed above. The 2021 Decision thus violates the treating physician rule in two respects. First, the ALJ failed to provide sufficiently "good reasons" for his decision to not assign controlling weight to the medical opinions of Drs. Murray and Zucker. *See, e.g.*, *Belleshen v. Comm'r of Soc. Sec.*, 851 F. App'x. 283, 285 (2d Cir. 2021) (summary order). Second, the ALJ similarly failed to provide good reasons for assigning "little weight" to both treating physicians' opinions. *Molina*, 2022 WL 16946823, at *10. These errors cannot be described as harmless and are grounds for remand. *See id.* ("In sum, the ALJ violated the treating physician rule by failing to provide good reasons for assigning

diminished weight to the opinions of [Plaintiff's] treat physician's [which is] . . . grounds for remand.").

**B.    An Award of Benefits Would Be Inappropriate**

At the end of his moving brief, Plaintiff states that the Commissioner's decision "should be reversed solely for a calculation and award of benefits."  (Pl. Br. at 51).  The Court disagrees.  Where, as here, the ALJ failed to provide sufficient reasons for rejecting the opinion of a treating physician, giving the ALJ an opportunity to correct the error on remand is the appropriate remedy. *See, e.g.*, *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (summary order) (finding failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand"); *accord Capuano v. Saul*, 665 F. Supp. 3d 312, 321 (E.D.N.Y. 2023).

Plaintiff argues that the medical evidence is "overwhelming" that he is physically and mentally disabled and that he has "overwhelmingly" rebutted the evidence of his physical activities (Pl. Br. at 51), but the Court does not agree with those characterizations.  Although it is unfortunate that Plaintiff "has already had multiple hearings and appeals without a proper resolution" (*id*.), he cites no authority holding that the length of a case, or its voluminous record, should entitle a claimant to benefits when that result may not be consistent with the evidence.

**C.    Bruzzese's Remaining Arguments**

The Court finds unconvincing Bruzzese's two other arguments for reversal of the 2021 Decision.

**1.    Severity of Bruzzese's Mental Impairments**

Bruzzese argues that the ALJ's step two finding of non-severe mental impairments constitutes reversible error because no evidence contradicts N.P. Thompson's and Dr. Wilkie's findings that Bruzzese "had not only severe but disabling mental impairments," *e.g.*, depression, anxiety, disturbed sleep, disturbed appetite, decreased energy, and suicidal ideation.  (Pl. Br. at 39-43). Plaintiff also argues that the ALJ "inappropriately focused on GAF scores in the record . . . [which] are not medical opinions."  (*Id.* at 44-45).

"An alleged impairment will be considered severe only when 'it significantly limits an individual's physical or mental abilities to do basic work activities.'"  *De Camacho v. O'Malley*, __ F. Supp. 3d __, No. 22 Civ. 7779 (RWL), 2024 WL 687286, at *11 (S.D.N.Y. Feb. 20, 2024) (quoting *Clark v. Saul*, 444 F. Supp. 3d 607, 622 (S.D.N.Y. 2020)).  "'A non-severe impairment is one that is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'"  *Id.* (quoting *Clark*, 444 F. Supp. 3d at 622).  "'If the impairments are not severe enough to limit significantly the claimant's ability to perform most jobs, by definition the impairment does not prevent the claimant from engaging in any substantial

gainful activity.'" *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).

As noted, to make its severity determination, an ALJ looks to the so-called "paragraph B" criteria listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  These are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing oneself.  20 C.F.R. § 404.1520a(c)(3).  Where an ALJ finds the degree of limitation to be "mild" or "none," then an ALJ will find that the impairment is not severe.  *Id.* § 404.1520a(c)(4), (d)(1).

Here, the ALJ concluded that Plaintiff's "medically determinable" mental impairments were "bipolar disorder, depressive disorder and anxiety disorder," and applied the paragraph B criteria to these conditions.  (AR 21-22).  Consistent with the Appeals Council remand order regarding the 2019 Decision, the 2021 Decision extensively applies each of the four criteria.  (*See id.*).  While acknowledging that Plaintiff did experience "mild" limitations, the ALJ concluded that Bruzzese's mental impairments were non-severe because "the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities."  (AR 22).  Substantial evidence supports that conclusion and Bruzzese fails to point to any evidence or deficiency in the ALJ's reasoning warranting reversal on this point.[17]

---

[17] The ALJ also found that the evidence failed to establish the presence of the "paragraph C" criteria.  (AR 22).  Bruzzese does not challenge this finding.

Plaintiff asserts that the ALJ should have credited N.P. Thompson's "well-supported and consistent" opinions.  (Pl. Br. at 41-42 (citing 20 C.F.R. Section 404.1502(g)).  But as the ALJ correctly determined (AR 29), because N.P. Thompson is not a doctor, her opinions are not entitled to controlling weight under the applicable regulations.  *See Perez v. Comm'r of Soc. Sec.*, No. 20 Civ. 5657 (GRB), 2022 WL 20681056, at *2 (E.D.N.Y. Aug. 19, 2022) ("nurse practitioners['] . . . opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight" under the treating physician rule) (citing 20 C.F.R. § 416.913(d)(1)); see *also* Pl. Br. at 45 (acknowledging that N.P. Thompson "is not an acceptable medical source").

Moreover, the ALJ specifically found N.P. Thompson's opinions to be inconsistent with her contemporaneous treatment notes, which "contain mostly benign medical findings" and demonstrate "intact memory, concentration[,] insight and judgment."  (AR 26, 29).  Just like in *De Camacho*, the ALJ properly "considered the evidence supporting [N.P. Thompson's] opinions and, while crediting [those] opinions regarding mild limitations, cited both internal inconsistencies in [N.P. Thompson's] records, as well as inconsistencies with records from [an]other provider[] [*i.e.*, Dr. Wilkie], that did not support moderate limitations."  *De Camacho*, 2024 WL 687286, at *12.

The ALJ likewise did not err in evaluating the evidence from Dr. Wilkie. Indeed, that evidence only undermines Bruzzese's claim that he suffered from

severe, function-limiting mental impairments during the relevant period, which is 2008 to 2014. Dr. Wilkie did not begin seeing Bruzzese until late 2012, and then in the context of his acrimonious divorce. (AR 1975-76). More importantly, Dr. Wilkie gave sworn testimony in Bruzzese's divorce case in 2014 that Bruzzese "is not depressed" and does not present "currently as being limited in function in any way." (AR 1199-1200). The evidence provided by Dr. Wilkie in the SSA proceedings in 2019 and 2021 strongly indicates that Bruzzese's depression did not become severe and result in the serious functional limitation she described until *after* 2014 and provides scant support for the proposition that he suffered from a severe impairment prior thereto. (*See* AR 126-28, 1975-77, 2214-24).

Therefore, the ALJ was within his rights to give little weight to both Dr. Wilkie's and N.P. Thompson's opinions. This is so especially in light of the additional evidence of Bruzzese's ability to maintain good relationships with family and friends, coach little league practices and games, drive long distances, and perform and oversee installation and repair work at his home and other properties. (AR 29-30).

Further, with respect to Plaintiff's arguments regarding the ALJ's reliance on GAF scores, the Government is correct that the ALJ expressly limited his reliance on these scores and did not place undue weight upon this one piece of evidence. (Gov. Br. at 21; *see* AR 29 (noting that the GAF scores are "a mere snapshot of the claimant's psychiatric functioning" and giving them

only "some weight as they are over an extended time period")).  By mentioning them as merely one factor among many in his evaluation of Dr. Wilkie and N.P. Thompson's opinions, the ALJ demonstrated his understanding that "GAF scores may be relevant to an ALJ's severity and RFC determinations, [but] they are intended to be used to make treatment decisions . . . and not disability determinations." *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 569 n.3 (S.D.N.Y. 2018) (citation omitted).

Even if the Court could find Plaintiff's argument about the ALJ's supposed failure to weigh the mental health evidence in a manner that Plaintiff would prefer at step two, "any error in that respect was nonetheless harmless because, in formulating [Bruzzese's] RFC, the ALJ explicitly considered the extent of any functional limitations posed by [Bruzzese's] mental impairments." *De Camacho*, 2024 WL 687286, at *12; *see* AR 29-30; *accord Rodriguez v. Saul*, No. 19 Civ. 9066 (JLC), 2021 WL 738348, at *12 (S.D.N.Y. Feb. 25, 2021) ("The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work.") (citation omitted).

In light of the foregoing circumstances, the Court finds no reversible error based on the ALJ's evaluation of Bruzzese's mental health impairments.  *See De*

*Camacho*, 2024 WL 687286, at *12. Of course, on remand, the ALJ must continue to account for Bruzzese's mental impairments in his RFC analysis.

### 2.    The ALJ Properly Weighed Plaintiff's Subjective Statements

Bruzzese's argument that the ALJ failed to properly weigh his subjective statements is similarly unavailing. Bruzzese argues that because the ALJ found that there is a medically determinable impairment that could reasonably be expected to produce the symptoms to which Bruzzese testified at the 2021 hearing, the ALJ was required to evaluate seven factors outlined in C.F.R. Section 404.1529(c)(3)(i)-(vii). (Pl. Br. at 46). These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage effectiveness, and side effects of medications taken to alleviate symptoms; (5) treatment other than medication; (6) other measures Bruzzese receives to relieve symptoms; and (7) other factors concerning Bruzzese's functional limitations and restrictions due to his symptoms. In Plaintiff's view, the ALJs evaluation of these factors did not amount to substantial evidence to support a finding of no disability. (*Id.* at 46-47).

For his part, the Commissioner contends that the ALJ was not required to discuss each of these factors (Gov. Br. at 21), and as long as the ALJ provided specific reasons supported by evidence in the record, his evaluation of Bruzzese's subjective statements was sufficient. (*Id.* at 22).

The Commissioner has the better of this argument. As he points out, the ALJ *did* consider Bruzzese's subjective testimony about his physical and mental conditions. (*Id.*). As noted in the 2021 Decision, the ALJ probed Bruzzese about the contents of the CDI Report and gave him an opportunity to refute its contents. (AR 24-25). He even credited Bruzzese's testimony that Plaintiff "had in fact engaged in many of these activities, but . . . received assistance with them." (AR 21). However, the ALJ went on to note that Bruzzese's testimony was only "partially consistent with the extensive medical record," and to consider that record in its entirety. (*See id.* at 25-26). In light of his consideration of the overall record, the ALJ was not required to give Plaintiff's subjective statements any more weight. *See Garcia v. Astrue*, No. 07 Civ. 6658 (DAB), 2009 WL 212405, at \*7 (S.D.N.Y. Jan. 29, 2009) ("The ALJ had significant discretion to discount the credibility of Plaintiff's complaints in light of . . . other objective evidence."); *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("As a fact-finder, the ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical evidence and other findings.") (cleaned up). In short, the ALJ's assessment of Plaintiff's testimony was not "patently unreasonable" and is "entitled to deference." *Williams v. Colvin*, No. 14 Civ. 9134 (KNF), 2015 U.S. Dist. LEXIS 165265, at \*17 (S.D.N.Y. Oct. 27, 2015) (cleaned up).

Finally, Plaintiff advances the argument that because Bruzzese has "an honorable work history with sustained earnings . . . for over 20 years," prior to his disability onset date, this fact should tip the scales in favor of a finding of disability.  (Pl. Br. at 48).  As the Commissioner notes in response (Gov. Br. at 22), a strong work history is "just one of many factors appropriately considered in assessing credibility."  *Wavercak v. Astrue*, 420 F. App'x. 91, 94 (2d Cir. 2011) (summary order) (cleaned up).  That Plaintiff's "good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment" the ALJ made about Plaintiff's testimony.  *Id*.  Thus, Plaintiff's argument on this point is unpersuasive.

## D.    Past Relevant Work Determination

Although not raised by Bruzzese, the Court also notes an apparent error in the ALJ's "past relevant work" analysis at step four that should be addressed on remand.

At step four, the ALJ found that Bruzzese was capable of performing his past relevant work as "ICO program manager."  (AR 31).  This referred to Bruzzese's work as an integrity control officer, his last position with the NYPD, which the vocational expert classified as a program manager job under DOT 189.167-030.  (AR 31; 2343).  Under SSA regulations, past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn it."  20 C.F.R. § 404.1560(b)(1).  The ALJ found that all three positions Bruzzese held

with the NYPD (police officer, police lieutenant, and ICO program manager) were "of long enough duration to allow the claimant to fully learn all duties of the job" and satisfied the other criteria of the regulation. (AR 31).

In respect of the ICO program manager position, however, the record does not support the ALJ's determination. The amount of time required to learn a job is based on its "specific vocational preparation" rating, or "SVP." *Barrett v. Astrue*, No. 10-CV- 618S, 2012 WL 895961, at *6 (W.D.N.Y. Mar. 15, 2012). The position of program manager, as reflected in the ALJ's 2021 Decision, has an SVP of 8. (AR 31; *see* U.S. Dep't of Labor, *Dictionary of Occupational Titles*, Code: 189.167-030). Occupations with an SVP of 8 require over four years to learn. U.S. Dep't of Labor, *Dictionary of Occupational Titles*, app. C. But Bruzzese testified he served as an integrity control officer "for a year" (AR 64), substantially below the four years required.

It is true (although not discussed in the ALJ's decision) that the vocational expert estimated that, "[c]onsidering the amount of time that he performed it," Bruzzese performed the integrity control officer job "at the SVP 6 or 7 level." (AR 2343). An occupation at the SVP 6 level requires only "[o]ver 1 year" to learn. U.S. Dep't of Labor, *Dictionary of Occupational Titles*, app. C. But even assuming Bruzzese's ability to perform his past relevant work as an integrity control officer is properly assessed using an SVP of 6 rather than 8, Bruzzese did not perform that work for over one year. Despite his testimony that he was in the job "for a year" (AR 64), the record reflects that Bruzzese did

not return to work following his December 2007 back surgery until after February 8, 2008.  (AR 1035-36).  His last day of work at the NYPD was December 31, 2008.  (AR 63, 729).  Therefore, Bruzzese performed work as an integrity control officer for less than eleven months.

It may be that any error at step four would have been harmless given the ALJ's independent finding at step five that there were other jobs in the national economy that Bruzzese could perform.  Regardless, on remand the ALJ should, as appropriate, reconsider Bruzzese's capability of performing his past relevant work in light of the above.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **GRANTED**, Defendant's cross-motion is **DENIED**, and this case is remanded to the SSA for further proceedings consistent with this opinion.

The Clerk of Court is respectfully directed to close the open motion at Docket Number 22 and to close this case.

**SO ORDERED.**

DATED:     New York, New York
           September 30, 2024

_____
GARY STEIN
United States Magistrate Judge